Filed 8/22/16  P. v. Harris CA3
Opinion following order vacating prior opinion

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>COLLEEN ANN HARRIS,<br><br>        Defendant and Appellant. | C079470<br><br>(Super. Ct. Nos. P13CRF0031,<br>        P13CRF0343) |

Seventy-one-year-old Colleen Ann Harris (defendant) shot dead her sleeping seventy-three-year-old husband Robert Harris (Harris), after she stewed for months about an affair he was having with a 35-year-old woman who lived in Mongolia.  Over 20 years before shooting Harris, defendant had also shot dead her then-husband, but she was acquitted of murdering him after the jury heard that defendant killed him after confronting him about molesting her daughter.  This prior-act evidence (which included her defense) was introduced to prove that Harris's shooting here was deliberate and

1

premeditated and was not an accident. Her defense to Harris's death was accident (without specifying who pulled the trigger). Regarding her defense of accident, defendant testified she and Harris were wrestling in the bedroom, he had a gun, she blacked out, and when she came to, Harris was dead. A jury found defendant guilty of the first degree murder of Harris.

On appeal, defendant contends the court erred in admitting evidence of the prior shooting, trial counsel was ineffective in his examination of witnesses, and the prosecutor committed misconduct during closing arguments. Disagreeing, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Shooting Of Harris*

At 6:05 p.m. on January 6, 2013, attorney David Weiner (trial counsel) called 911 to report there had been a homicide on Wilderness Court in Placerville. Trial counsel knew about Harris's death because defendant had called him to report it, and trial counsel had just met with defendant in his car outside the Placerville house, and the two talked in person, while defendant "felt like [she] was in a fog."[1]

When sheriff deputies came to the Placerville house, they saw defendant climb onto a countertop and put something on top of the kitchen cabinet. That something turned out to be a manila envelope with checkbooks inside. They then saw defendant come out of the house. When police asked her what was going on, she initially said, "I can't talk about it," but she eventually said that her husband was dead inside the house, he had been shot, and she had covered him with a blanket.

---

[1] Defendant later told police that she did not have any particular reason to call trial counsel that day and that she just called him every so often to find out how he and his kids were doing. As to being in a fog, defendant testified at trial that she met with her psychologist, Dr. Norman Tressor, for a total of 25 hours to help her remember exactly what happened on the night Harris was shot.

Sheriff's deputies went inside the house. In the master bedroom, they found Harris in bed with most of his face missing and blood, brain, and bone matter scattered throughout the room. There was no injury to Harris's hand or arm, so the police did not think the gunshot was self-inflicted. There was a significant pooling of Harris's blood in the sleeping position in which he was found, which indicated he had been shot in his sleep. There was a reconfigured pistol-grip style double barrel shotgun at Harris's left leg, a substantial distance from where his arm would have been able to reach. The shotgun had been wiped down, so there were no fingerprints or blood on it. The areas near Harris's body that had blood spatter on them (the headboard and the ceiling above Harris) also had been wiped down. There was no sign of a struggle or fight in the house.

Defendant was taken to a hospital and also interviewed by police. She answered the doctor's questions coherently, did not have difficulty understanding the questions, and did not complain about loss of memory or consciousness. Police noticed she had a bright red abrasion on her middle finger, but she could not explain to police how she got this injury. In the police's opinion, defendant's finger injury was consistent with her having fired the shotgun. Defendant also had a bruise on the center of her chest on her cleavage line. Based on the way this shotgun had been reconfigured, the gun could have recoiled on the person pulling the trigger, causing bruising in the area where defendant had been hurt.

Prior to Harris's death, Harris and defendant had been having marital troubles, caused by an affair he was having with a woman he met on a Mongolian business trip. Harris had gone to Mongolia in the summer of 2012, and defendant had learned of the affair during that time.

At the beginning of September 2012, defendant began texting Harris's daughter, Pamela Stirling, expressing surprise, sadness, and anger about the affair.

In mid-September, Harris flew from Mongolia to Stirling's Los Angeles house, and then the two of them travelled up to the Placerville house together. Harris told

3

Stirling he was worried about seeing defendant for the first time after she had learned of the affair because of "the demise of her [former] husband." He was "afraid the defendant was going to do something horrible to him as she did to her [former] husband. He was afraid that she was going to kill him." Stirling did not counsel her father against moving back in with defendant because Stirling had to "let her [father] make his own decisions," but "[t]he thought of him being injured never left [her] mind." Stirling had known about defendant killing her former husband for over 20 years.

When Harris and Stirling arrived at the Placerville house, defendant was calm, sad, passive, and quiet. When Harris told defendant he was planning on staying at his Tahoe cabin, she was not pleased. Harris and Stirling left for Tahoe anyway. That weekend, Harris began moving his property to the Tahoe cabin and changed his mailing addresses to the Tahoe cabin as well.

During October, Stirling and Harris continued communicating, and Stirling and defendant did as well, although less than before. Harris told Stirling that he was going to temporarily stay with defendant at the Placerville house to help her recover from a hip replacement surgery she was having in mid-November.

In November, Harris was at the Placerville house through Thanksgiving to celebrate the holiday with defendant. Stirling, her husband, and her three children joined on the day after Thanksgiving. Defendant told Stirling that she was frustrated that Harris was not giving her answers about whether he wanted to stay married, whether he was going to live permanently in Tahoe, and whether he was going to continue his affair.

Over the Christmas holidays, defendant and Harris drove together down to Stirling's house in Los Angeles. Defendant was very angry with Harris because he was not affectionate towards her and because she had found a receipt for a necklace Harris had bought his Mongolian girlfriend. Harris told Stirling that he intended to move out of the Placerville house back to Tahoe after the new year and had started consulting a church counselor to help him separate from defendant.

4

The last text message Stirling received from defendant was on January 5, 2013, the night before Harris died. In it, defendant wrote, "Your dad just called his Mongolian love ten minutes ago." "He still will not talk about anything that deals with he and I." "I sit here wondering who I am married to." Harris and defendant had been married for about 23 years at the time Harris was shot.

B

*Defendant's 1985 Killing Of Her Former Husband, James Batten*

Prior to defendant's marriage to Harris, defendant was married to James (Jim) Batten. At the time defendant and Batten met, defendant's daughter from a prior marriage, T. B., was about 11 years old and really liked Batten. But after the first year of marriage, Batten began sexually molesting T. B., which quickly turned to intercourse after defendant had a double mastectomy and Batten claimed he "needed" T. B. because he could not have sex with defendant anymore. At one point, T. B. told defendant about the molestation, and defendant and Batten assured her that it would not continue. But it did, although T. B. did not tell defendant because defendant was becoming sicker with the cancer treatment.

When T. B. turned 18 (and two years before defendant shot Batten in July 1985), T. B. moved out of the family home. She would come back regularly, however, to do her laundry, and Batten would continue with his sexual advances.

The day before defendant shot Batten, Batten tried to kiss T. B. and told her that he and defendant were going to get a divorce, now she (T. B.) and he could "really be together," and he would "never leave [her] alone." T. B. told defendant that day about what had happened. Defendant went to see Batten. Batten held a gun to defendant's head and forced her to orally copulate him while telling defendant she "did not do that nearly as well as her daughter did." Defendant heard a click and thought that Batten had shot her. Later, defendant called trial counsel. Afterward, she called 911 and said she thought she shot her husband (from whom she was separated at the time) in the bedroom

5

on Wilderness Way (the same Placerville house where defendant and Harris later lived). She then backtracked to the dispatcher and said, "I don't know if I even shot him."

Defendant was charged with murdering Batten, and trial counsel represented her in that murder trial as well. Defendant was acquitted of murdering Batten.

About 18 years after defendant shot Batten, T. B. was married to someone she described as very controlling. T. B.'s husband did not like defendant, and he drafted a declaration for T. B. to sign to support a temporary restraining order against defendant. Some of the statements in the declaration were true and some were false, but T. B. signed the declaration because she had two young children, and her then-husband was the sole provider for her family. In the declaration T. B. wrote she was "terrified of [her] mother because [she had] seen [her mother] pull guns on family members in the past" and that she had "seen her mother pull a pistol on [Batten] when she was 16 years old." She had also seen her mother use a gun to ward off her biological father, who at the time was beating her infant brother "pretty bad."

## DISCUSSION

### I

*The Court Acted Within Its Discretion And Did Not Violate Defendant's Due Process*
*Right To A Fair Trial Or Double Jeopardy Principles*
*In Admitting Evidence Of Defendant's Killing Of Her Former Husband*

Defendant contends the trial court abused its discretion and violated her due process right to a fair trial by admitting evidence she killed her former husband. She argues that the evidence of her former husband's shooting "was not probative, was inflammatory, . . . was highly prejudicial," and the incident was remote in time. Defendant further contends admission of this evidence was a retrial of the 1985 murder charge and violated her right to be free of double jeopardy and violated the collateral estoppel doctrine. We disagree on all points.

The court admitted evidence that defendant killed her former husband to show intent to kill Harris, to show lack of accident or mistake, and to show she acted with deliberation and with premeditation when killing Harris.  In doing so, the court did not abuse its discretion or violate defendant's constitutional rights.  We explain below.

In *People v. Steele* (2002) 27 Cal.4th 1230 (*Steele*), a case similar in many respects to this one, the trial court admitted prior-act evidence that the defendant stabbed to death a teenage babysitter 17 years before the current murder, which was the stabbing death of another young woman.  (*Id*. at pp. 1238-1239, 1243-1244.)  On appeal, the defendant claimed the court erred in admitting evidence of the prior killing for many of the same reasons urged here (i.e., intent was not an issue, the prior killing was remote, and the prior killing was too prejudicial), but our Supreme Court disagreed.  It explained as follows:  "Here, the facts of intent to kill, premeditation, and deliberation were material. . . .   The previous killing . . . had a tendency to prove these facts. . . .  The [babysitter] and [current] killings bore several similarities.  Both victims suffered manual strangulation and received a cluster of about eight stab wounds in the chest or abdomen.  The victims resembled each other somewhat.  Moreover, in both cases, defendant admitted the killing to the police shortly afterwards, but supplied an explanation. . . .  [¶] The two killings were similar enough to make the earlier one relevant to the mental state with which defendant committed the later one."  (*Id*. at pp. 1243-1244.)  "There is also no rule or policy requiring exclusion. . . .  [E]vidence of other crimes is inherently prejudicial.  [Citation.]  But this circumstance means the court must exercise its discretion, not that it must always exclude the evidence.  Here, the [babysitter's] killing was highly probative of defendant's mental state when he killed [the current victim], a critical issue."  (*Id*. at p. 1245.)  "Defendant [also] argues that the first killing, 17 years before the second, was too remote to have significant probative value. . . .  [G]iven the similarities of the killings, we do not believe the time factor compelled the court to exercise its discretion in only one way."  (*Id*. at p. 1245.)

Here, *Steele's* analysis controls in many respects. Intent to kill and premeditation and deliberation were central issues at trial because the defense was an accident. The previous killing had a tendency in reason to prove these facts because, as the trial court noted when admitting the evidence, there were "very significant similarities between the two shootings." Those similarities included that the victims were defendant's husbands, defendant shot them while in the bedroom during a time when they were having marital difficulties, there was a delay in reporting the shootings, defendant called other people prior to calling police (namely, trial counsel), and she claimed she did not remember what had happened. There also was no policy against excluding the evidence even though the prior killing was remote (28 years separated the two killings) and no conviction resulted (unlike in *Steele*). The trial court here was careful to instruct the jurors that there was a different standard of proof applicable to prior-act evidence and that the People had the burden of proving by clear and convincing evidence defendant murdered her first husband and that if they had not met their burden, the jurors must disregard the evidence entirely.

Finally, *Steele's* analysis also controls defendant's federal constitutional claims. As to defendant's claim that admission of the prior killing violated her due process right to a fair trial, *Steele* holds that where evidence of a prior killing "supported the permissible inference that the second killing was intended and premeditated," there is no due process violation. (*Steele*, *supra*, 27 Cal.4th at p. 1246.) As to defendant's collateral estoppel and double jeopardy claims, "no one is seeking to relitigate [the prior] murder." "This case involves solely defendant's guilt for killing [the current victim]. Both [the California Supreme Court] and the United States Supreme Court have held that principles of double jeopardy, including its collateral estoppel component, permit the admission of otherwise proper evidence of a prior crime even if the person had been entirely acquitted of that prior crime." (*Steele*, at p. 1245, fn. 2.)

8

In summary, there was no error, federal or otherwise, in admitting evidence of the prior killing.

## II

*Trial Counsel Was Not Ineffective For Failing To Object To Evidence About Guns And Defendant's Dangerousness And For Referring To Defendant As A "Murderess" And The Prior Killing As "Murder"*

Defendant contends her counsel was ineffective during various points of witness examination. We take each in turn, keeping in mind the following standard. To establish ineffective assistance of counsel, defendant bears the burden of establishing both that trial counsel's performance fell below an objective standard of reasonableness and, absent trial counsel's error, it is reasonably probable that the verdict would have been more favorable to her. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [80 L.Ed.2d 674, 694, 698].) We give great deference to trial counsel's reasonable tactical decisions (*People v. Weaver* (2001) 26 Cal.4th 876, 925) and reverse " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission' " (*People v. Frye* (1998) 18 Cal.4th 894, 980).

## A

*Trial Counsel Was Not Deficient In Failing To Object To Relevant Evidence Regarding Defendant's Use Of Guns, And Her Strategy Of Trying To Minimize That Evidence During Cross-Examination Was Reasonable*

Defendant contends her trial counsel was deficient in failing to object to the prosecutor's cross-examination of T. B. regarding statements T. B. made about defendant's use of guns. The statements were made in T. B.'s 2003 declaration in support of a temporary restraining order against defendant. Specifically, T. B. testified that she wrote she was "terrified of [her] mother because [she had] seen her pull guns on family members in the past" and that she had seen her mother pull a pistol on defendant's former husband Batten when she was 16 years old.

9

Defense counsel was not deficient for failing to object because defendant's familiarity with guns was relevant to the People's theory of this case that she used the shotgun to shoot Harris. Moreover, defense counsel used a reasonable strategy to minimize the impact of this evidence. Specifically, in redirect examination of T. B., counsel elicited that at the time T. B. signed those declarations, she was going through postpartum depression, she designed those declarations to "make [her] mother look like a terrible person," she would not sign the declarations today, and she had seen her mother use a gun to ward off T. B.'s biological father, who at the time was beating her infant brother "pretty bad." While the prosecutor came back in recross-examination and pointed out that T. B. said harmful things about defendant in her declaration, including that her mother "pulled a shotgun on [her] biological father . . . when [she] was nine years old," trial counsel elicited from T. B. that the whole point of those declarations was to make her mother look terrible, and in reality, her mother was not terrible. In sum, there was nothing deficient about trial counsel's performance with regard to how he handled this gun evidence.

B

*Trial Counsel Was Not Ineffective For Failing To Object To Hearsay Evidence That Defendant Was Dangerous And For Referring To Defendant As A "Murderess" And The Prior Killing As A "Murder"*

Defendant raises a number of contentions regarding trial counsel's handling of questions and evidence regarding defendant's alleged dangerousness and the terminology he used when questioning Stirling. We explain and analyze these contentions below.

Defendant contends trial counsel was deficient in failing to object on hearsay grounds to two questions the prosecutor asked Stirling that elicited hearsay statements that defendant was dangerous. The first question was, "Did your father [i.e., Harris] tell you why he was worried about seeing the defendant for the first time?" Stirling responded, among other things, that Harris told her, "you know, Pam, you remember the

10

demise of her [former] husband." The second question was, "Can you tell me what his concerns were?" Stirling replied, among other things, "the defendant was going to do something horrible to him as she did to her [former] husband. He was afraid that she was going to kill him. And we talked in great detail about safety . . . . [¶] . . . [¶] He was scared that when he was asleep that he wouldn't hear her if she came through the door at Tahoe . . . ."

Defendant further contends trial counsel was deficient for suggesting defendant was dangerous in his cross-examination of Stirling by eliciting further references to defendant being dangerous and referring to defendant's 1985 shooting of her former husband as "murder" and calling her a "murderess." Specifically, during cross-examination of Stirling, trial counsel asked why she did not counsel her father against moving back in with defendant to care for her. Stirling responded that she had to let her father make his own decisions, but "[t]he thought of him being injured never left [her] mind" and that she was "always concerned for his safety." Trial counsel followed up by asking whether she asked her father if he felt safe around defendant and that "obviously" he must have or else he would not have gone there. Stirling replied that he said he was "not comfortable and often sleeps with one eye open." Trial counsel followed up by asking if Stirling asked her father whether he thought defendant was a danger to him. Stirling responded, "he didn't say yes," and "he did not think she would do anything, but considering the demise of her [former] husband, it was always a possibility," "that concerned him," and "[h]e said that to [Stirling] very often." Trial counsel then elicited from Stirling that she had known about defendant killing her former husband for over 20 years and then asked why she did not "counsel him" once she learned he was marrying a "murderess" or ask him why he was marrying somebody who had been acquitted of "murder." Stirling responded that it was defendant who first told Stirling she had killed her former husband (and it was after she and her father had been married for four or five years) and that her former husband was a "very bad man, who did awful things to her

11

daughter" and Stirling added that Harris was "very, very happy with the defendant during this time" so she "did not approach the subject with him."

While defendant on appeal claims that trial counsel's failure to object to the hearsay evidence about defendant's dangerousness and eliciting evidence that Stirling and her father thought defendant was dangerous and calling defendant a "murderess" and referring to the killing of her former husband as "murder" was "prejudicial and inflammatory," there was a sound tactical reason for counsel's actions. Counsel was demonstrating to the jury that Stirling and her father were really not afraid of defendant and indeed had nothing to fear. They had known for decades about her killing her former husband, had not taken precautionary action to show they were afraid of her, and that Harris really could not have been afraid of defendant because he returned to the Placerville house voluntarily to care for her. In closing argument, trial counsel also pointed out that it seemed "odd" that Stirling would bring herself, her children, and Harris's grandchildren to the Placerville house if Stirling really believed that defendant posed a danger and it was just as odd that she would invite defendant along with her father to Christmas at her house later that year if she truly feared defendant. Under these circumstances, trial counsel's performance was not deficient.

III

*The Prosecutor Did Not Commit Misconduct In Closing Arguments*

Defendant contends the prosecutor committed numerous acts of misconduct in closing arguments, violating her federal and state due process right to a fair trial. We take each in turn, keeping in mind the following standard. "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use

12

of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) As we will explain below, there was no misconduct.

A

*The Prosecutor Did Not Impugn The Integrity Of Trial Counsel*

Defendant claims the prosecutor committed misconduct by arguing that she and her trial counsel fabricated her defense in the 1985 murder trial and again in this trial. Specifically, the prosecutor argued in closing the following: There were times in defendant's testimony where she "couldn't answer a question directly or where she changed her answer, had to be put back on script by her attorney." She "selectively forg[ot]" she was not just a suspect in the 1985 killing, she was the defendant in that case and "[s]he was represented by the same defense attorney she met with for 90 minutes earlier that day." "We didn't know the defense's theory after [trial counsel's] opening statement. He said, 'My client will tell you what happened in the bedroom, whether it was homicide or suicide or accident. . . . .' [¶] Well if you're telling the truth, you don't need to figure out what you're going to say or what you're going to do, you just tell the truth." Defendant claimed her relationship with trial counsel was social, but that was not her entire relationship with him, as he represented her in the prior murder trial. Defendant claimed she was in a fog and "[s]he didn't want to say she met with her criminal defense attorney from the last time her husband got killed." Defendant claimed to be moving valuables around the house after trial counsel left but before the sheriff's department arrived and "testified to putting some valuables up on a shelf. She doesn't want you to think she is writing a check to [trial counsel]." "[T]he defense is something that is being made up on the fly in response to the People's evidence. . . . This is not a game. Might be to the defense team, but it's not for the prosecution team."

These comments were fair arguments based on the state of the evidence. "A criminal prosecutor has much latitude when making a closing argument. H[is] argument may be strongly worded and vigorous so long as it fairly comments on the evidence

13

admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1330.) Here, the prosecutor accurately noted that trial counsel had represented defendant in her prior murder trial and that was the primary basis for their relationship. Moreover, there was evidence from which a reasonable inference could be drawn that she was trying to hide a checkbook right after she had talked with trial counsel. When police first arrived at defendant's house in response to trial counsel's 911 call, they saw defendant climb onto a countertop and put something on top of the kitchen cabinet. That something turned out to be a manila envelope with checkbooks inside.

B

*The Prosecutor Did Not Misstate The Law*

Defendant on appeal points to a number of arguments made by the prosecutor in closing that she claims misstated the law. We take each in turn, explaining why there was no misconduct.

1

*The Prosecutor Did Not Make Improper Propensity Arguments*

Trial counsel argued, "the more often one kills, especially under similar circumstances, the more reasonable it is to believe the killing was intended and premeditated." Defendant on appeal contends this was improper propensity argument, "nothing more than a statement of probabilities." Not so. The California Supreme Court has sanctioned this statement of the law in a very similar circumstance (i.e., evidence of a prior murder introduced in a current murder prosecution), stating, "the doctrine of chances teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated." (*People v. Steele*, *supra*, 27 Cal. 4th at p. 1244.)

14

## 2

### *The Prosecutor Did Not Shift The Burden Of Proof To Defendant*

The prosecutor argued that in looking at the defense case, "importantly, . . . keep[] in mind, first that the People have the burden of proof.  I have to prove my case beyond a reasonable doubt in order for you to vote to convict.  [¶]  But if the defense asserts or claims something in her defense, the defense team has the burden of production."  The prosecutor explained that defendant claimed a "memory issue for traumatic events," noted that her psychologist Dr. Tressor was "not available as a witness to the defense because of a medical issue," "so I'm not going to . . . mislead you and suggest that they could have called Dr. Tressor," "[b]ut there are many, many experts that they could call to evaluate the defendant and talk about this."  "The law is clear that if the defense isn't prepared to go forward because they lost a witness, or they need to obtain a witness, the Court would grant that continuance.  There was no motion to continue filed in this case by the defense" and "[i]f you can't afford an expert witness that you need in your defense, the Court will appoint one for you."  The prosecutor also mentioned the current condition of the shotgun and noted that trial counsel was "asking you to go back into that jury room and just speculate.  And the reason why he is doing that is because if you focus on the defense evidence, if you challenge the defense's evidence, you see it doesn't add up to reasonable doubt."  Defendant on appeal contends that these arguments shifted the burden of proof to defendant and gave defense the burden of production.

These arguments were well within the permissible range.  The California Supreme Court has explained that a prosecutor's statements do not constitute impermissible burden shifting simply because the prosecutor correctly notes that a defendant did not produce any evidence, so long as the prosecutor does not state a defendant has the burden of proving her innocence.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)  Here the prosecutor correctly noted the defense did not back up its own defense even though it could have brought in an expert to testify about her alleged failure to recall, and the

15

prosecutor never stated or suggested that defendant had the burden of proving her innocence. In fact, the "[p]rosecutor . . . reiterated that the prosecution had the burden of proof by sufficient evidence [of] . . . defendant's guilt . . . ." (*Bradford*, at p. 1340.) Thus, "the prosecutor's comments [did not] impermissibly shift the burden of proof to defendant." (*Ibid*.)

3

*The Prosecutor Did Not Misrepresent*

*The Law Of Voluntary Manslaughter*

The prosecutor argued that as to the lesser offense of voluntary manslaughter, the so called "heat of passion manslaughter," the "instructions . . . are very specific . . . as to the degree of provocation." It "has to be a degree of provocation that would rob a person of average temperament [of] their ability to essentially reason, their ability to premeditate and deliberate. It has to be a provocation *that is somewhat immediate* and does not allow for a cooling off period." (Italics added.) Defendant on appeal contends this was a material misrepresentation of the law because the prosecutor "told the jury provocation could only arise over a short period of time." She quotes the jury instruction here, CALCRIM No. 570, which actually demonstrates there was no error. As the jury was instructed, "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant *must have acted under direct and immediate influence of provocation* . . . . Sufficient provocation may occur over a short or long period of time." (Italics added.) The prosecutor's point was that "the People's theory is that the defendant waited until [Harris] was asleep to shoot and kill him. That's a cooling off period." Defendant was still upset, frustrated, angry, and obsessing about the affair but months passed between learning about the affair and her deciding to kill him, which was "more than sufficient time for a reasonable person of average temperament to cool off." This argument was within the law and indeed supported by the voluntary manslaughter instruction given.

16

# DISPOSITION

The judgment is affirmed.

/s/
Robie, Acting P. J.

We concur:

/s/
Duarte, J.

/s/
Renner, J.